# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00327-COA

**DAVID HUNTER MOORE**                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/29/2022 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM SR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | STEVEN E. FARESE SR. |
| | STEVEN E. FARESE JR. |
| | JIM D. WAIDE |
| | JOSEPH WHITTEN COOPER |
| | MATTHEW W. KITCHENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA ROSENBLATT |
| DISTRICT ATTORNEY: | ROBERT R. MORRIS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/02/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., GREENLEE AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     David Hunter Moore was convicted in the Circuit Court of DeSoto County, Mississippi, of fifteen counts of video voyeurism and one count of video voyeurism of a child under the age of sixteen years, all in violation of Mississippi Code Annotated section 97-29-63 (Supp. 2015).

## FACTS AND PROCEDURAL HISTORY

¶2.     Moore is co-owner of Advantage One LLC (Advantage One) and Moore Advanced Inc. (Advanced). These businesses occupy Suites D and E in a strip-center-type building.

On January 2, 2019, before leaving work for the day, Sholonda Williams, an employee of Advanced, went to use the restroom located directly in front of her desk area. She discovered a telephone charger plugged into an electrical outlet in the employees' restroom.[1] Since her phone had died, Sholonda plugged her phone into the charger. The phone began charging, but she discovered there was nowhere to place her phone. According to her testimony, she unplugged the charger, and a "little blue infrared blinking light kind of winked at me in the top corner." Sholonda explained that she took pictures of the charger and used the internet to "locate the product to make sure that I wasn't mistaken or that it was what I thought it was." Sholonda testified that she located the "exact product" on the internet and found that it was also a camera in addition to a charger.

¶3. Without saying anything to the other employees, Sholonda left work and went home after finding the device. She called a relative who is an attorney and was advised to contact the police and file a report. The next day, planning to resign from her position at Advanced, Sholonda went to the Hernando Police Department to seek assistance in retrieving her belongings from her workplace and to make a report. She gave police an oral and a written statement concerning her discovery of the camera/charger at work. She identified Moore and Justin Hankins as the owners of the business, and she suspected one of them had placed the device in the restroom. Sholonda testified that the three people she spoke to at the police

---

[1] Sholonda explained at the suppression hearing that the bathroom was "like a closet restroom" that was open with no stalls, just a "wall, a sink, and a toilet."

station were a female officer whose last name was McCoy and Detectives Michael Hansbro and Dexter Gates. According to Officer McCoy, Sholonda requested an officer to accompany her to Advanced because she had found a camera in the bathroom and wished to resign. McCoy had her fill out a voluntary witness statement, and then Sholonda spoke with Gates and Hansbro.

¶4. After Sholonda gave her statement, she e-mailed Hansbro the photographs she had taken of the device with her phone. At that point, Detective Hansbro went to his office, searched the internet, and found "a device that looked identical or visually identical to the one in the photo that [Sholonda] supplied." Hansbro confirmed that the device was a black USB charger with a hidden camera. At trial, Hansbro explained that during his investigation of the device, he learned that it had an SD memory card that could capture images. He also learned the camera/charger had motion detection.

¶5. Having been advised that Sholonda was employed by Advanced and that the camera was there the day before her report was filed, Hansbro and Gates did some research. They found that filming a person without the person's permission in a place where the person would intend to be in a state of undress and have an expectation of privacy is a felony. Hansbro and Gates then drove by the building where Advanced was located and ran the tags of Moore and Hankins, who Sholonda had identified as her employers. At that point, Hansbro typed up the underlying facts and circumstances in order to procure a search warrant. After Hansbro and Gates got additional officers lined up to accompany them to

3

serve the search warrants, they went to see municipal Judge Robert Quimby. After swearing in the officers, Judge Quimby reviewed the underlying facts sheet, heard their testimony concerning the incident, and signed the search warrant.

¶6.    After obtaining the search warrant, Hansbro asked Sholonda to go into the business and confirm whether the camera was still there. When Sholonda entered the business, Hansbro and the others were parked directly across the street from the business. Sholonda testified that when she entered the bathroom, she shut the door and locked it "probably for [her] own safety." She also testified that her only purpose for entering the bathroom was to look for the camera. After Sholonda confirmed that the camera was still there, Hansbro, Gates, and two other officers entered the businesses and found Moore and Hankins.

¶7.    Upon entering the building, Hansbro observed that Advanced and Advantage One were connected by an open doorway between the two suites. Sholonda testified that the connecting door was always open, though it did have a lock. Hansbro testified that he and the other officers entered the building through Suite D, because that was how Sholonda entered. Moore and Hansbro went to Moore's office located in Suite E, and Hansbro advised him that they were there to serve the search warrant. Meanwhile, Gates was talking with Hankins elsewhere in the building. Hansbro testified that when he advised Moore why they were there, Moore admitted to owning the camera/charger and advised that he had purchased some from Amazon. Moore told Hansbro that he had initially placed the cameras in the office to keep people from stealing. When Hansbro asked him what was depicted in the

4

videos, Moore said they showed "[b]reasts and vaginas."

¶8.     According to Hansbro, when he realized that Sholonda's desk area and the restroom at issue were in Suite D and their warrant only authorized a search of Suite E, "out of an abundance of caution" he went back to get an amended search warrant to include both suites.[2]  He left the other officers in place to secure the premises until he obtained the amended search warrant.  The only change he made to the affidavit for a search warrant and to the warrant itself was to add Suite D as a place to be searched.  According to Hansbro's testimony, he, Gates, and the other officers conducted the search and seized the evidence only after the second warrant was executed.  Hansbro testified that the language in the amended warrant was "identical in every way to the first one except for the addition of Suite D." Judge Quimby signed the amended warrant, and Hansbro returned to the businesses, met with Gates and Moore, and then searched both businesses.

¶9.     Hansbro testified that after the second warrant was executed, he seized the bathroom camera Sholonda had described, but admitted that before he executed the amended warrant, he "peeked" into the bathroom to verify the camera's location.  After obtaining the amended warrant, Hansbro and the other officers seized forty-five pieces of evidence related to the

---

[2] Photos taken from the street in front of the businesses show signs that indicate that Advanced occupied Suite E, and Advantage One occupied Suite D.  Sholonda told the officers before they prepared the affidavit and search warrant that she worked for Advanced, so the warrant was prepared to search Suite E.  However, once inside, the officers discovered that her workspace and the bathroom were both in Suite D.  Sholonda's written statement given to officers did not make any reference to a particular suite.

5

search warrant. The devices included three USB hidden cameras, numerous SD cards, numerous flash drives, numerous cell phones, and three Dell laptops.[3]

¶10. The evidence was given to Detective Greg Horton, a digital forensic examiner with the DeSoto County Sheriff's Department, who extracted the images captured by the devices seized during the search. He explained at trial:

> Q.     Let's talk about what evidence was delivered to you. Did you
>         receive any iPhones?
>
> A.     iPhones, yes, sir, I did. An iPhone 10 and an iPhone 7.
>
> Q.     Did you receive any computers?
>
> A.     Yes, sir, I have a Dell laptop that I looked at.
>
> Q.     And did you receive any SD cards?
>
> A.     Yes, sir. I had a SanDisk SD card, a Samsung, and I believe a
>         Kingston.

Horton went on to explain that he performed digital forensic examinations of all the devices and extracted the information he found. He placed the information he extracted on an external hard drive and gave it to Hansbro.

¶11. Law enforcement ultimately learned that Moore had recorded people in the other bathroom at the business and at his home. Hansbro was able to view videos of Advanced employees from both suites using the bathroom. Hansbro also saw images from a bathroom

---

[3] Other than the camera in the bathroom, all items recovered in the search of the businesses apparently were retrieved from Moore's office in Suite E.

they could not identify at the time, but they ultimately learned the bathroom was located in Moore's home. At least two of the victims who testified at trial were videoed at Moore's home.

¶12. On May 8, 2019, a DeSoto County grand jury indicted Moore for one count of conspiracy to commit video voyeurism, seventeen counts of video voyeurism, one count of video voyeurism against a victim under sixteen years of age, and one count of making a video of a child under the age of eighteen engaging in sexually explicit conduct. Prior to trial, Moore's trial counsel filed an "Amended Motion to Suppress" challenging the admissibility of the evidence gathered during the search. Moore contended the following in this motion:

1. The Authorities lacked sufficient information to procure a search warrant.

2. The Authorities engaged in impermissible conduct prior to execution of the alleged warrant.

3. The Authorities failed to properly execute the alleged search warrant.

4. Neither the Officers nor the issuing magistrate followed the mandates of the Rules of Criminal Procedure.

5. The alleged "2nd" warrant was overly broad and the result of an illegal warrantless search prior to its execution.

6. The alleged "1st" warrant is void *ab initio*.

7. The Officers engaged in outrageous conduct to such an extent to undermine the integrity of the judicial process.

8. The Officers (by their silence and misleading narratives and reports) attempted to conceal their misdeeds, thereby undermining the 4th and 14th Amendment to the Mississippi and U.S. Constitution.

After an extensive pre-trial hearing, the trial court denied the motion by written order of the trial court.[4]

¶13.    At trial, the jury found Moore guilty of fifteen counts of video voyeurism and one count of video voyeurism against a victim under sixteen years of age.[5]  On March 29, 2022, Moore was sentenced to five years on each of the video voyeurism counts and ten years on the count of video voyeurism against a minor, all to run concurrently.  The circuit court fined Moore $5,000 for each of the sixteen counts on which he was convicted.  Moore was also required to register as a sex offender.  After Moore's post-trial motions were denied, he appealed to this Court.

## ANALYSIS

¶14.    We now address the issues Moore raises on appeal.

> **I.      Whether all the State's evidence should have been suppressed because of the officers' intentional non-disclosure that there were two warrants, one of which had been destroyed and did not specify the correct premises to be searched.**

¶15.    As noted above, an evidentiary hearing was conducted on Moore's "Amended Motion to Suppress," and the trial court denied the motion.  Our standard of review of the trial court's decision was stated in *Wallace v. State*, 363 So. 3d 712, 715-16 (¶12) (Miss. Ct. App.

---

[4] The trial court's ruling will be addressed in context as it relates to each issue on appeal.

[5] Moore was found not guilty on the conspiracy count and two of the counts of video voyeurism.  The count regarding the depiction of a child engaging in sexual conduct was retired to the file.

8

2019):

> There is a mixed standard of review when we examine whether evidence could have been suppressed due to a claim of unlawful search and seizure. We review de novo whether there was reasonable suspicion or probable cause for the search and seizure. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). But our review of the trial court's findings on these issues are more deferential and restricted to the "historical facts reviewed under the substantial evidence and clearly erroneous standards." *Dies v. State*, 926 So. 2d 910, 917 (¶20) (Miss. 2006) (citing *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (¶11) (Miss. 1999)). On review, this Court is "not limited to evidence presented to the trial judge at the suppression hearing; this Court may look to the entire record to determine whether the trial judge's findings are supported by substantial evidence." *Galloway v. State*, 122 So. 3d 614, 669 (¶181) (Miss. 2013) (citing *Holland v. State*, 587 So. 2d 848, 855 (Miss. 1991)).

(Footnote omitted).

¶16. In his first assignment of error, Moore contends that the trial court erred by failing to suppress all evidence seized as a result of law enforcement's search on January 3, 2019, at his business premises located at 2765 Highway 51 S., Suites D & E, Hernando, Mississippi. In the "Summary of the Arguments" portion of his brief, Moore contends that "all evidence should have been suppressed because of outrageous government conduct in violation of the Fourteenth Amendment of the United States Constitution." The heading of this first assignment of error contends that "all the State's evidence should have been suppressed because of officers' intentional non-disclosure of the fact that there were two (2) warrants, one of which had been destroyed and which did not specify the correct premises to be searched."

¶17. Moore offers a smorgasbord of complaints concerning law enforcement's actions in

9

obtaining, executing, and returning the search warrants in this case. Moore also includes complaints concerning Judge Quimby's actions. To support his contention that "the fruits of the search should have been suppressed," he cites United States Supreme Court cases but fails to explain how the holdings in those cases aid his cause.

¶18. In *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022), this Court explained:

> Mississippi Rule of Appellate Procedure 28(a)(7) governs the argument section of appellate briefs, and states, "The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." The rule "does not simply require a party to mention authority; the authority must be used to **develop the argument in a meaningful way**." *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016) (emphasis added) (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). **Arguments that do not comply with the rule are procedurally barred**. *Hill v. State*, 215 So. 3d 518, 524 (¶10) (Miss. Ct. App. 2017).

(Second emphasis added). Moore has failed to cite authority for several of his allegations in this assignment and does not "develop the argument in a meaningful way" to support his claim that all the evidence should have been suppressed. It appears that he is claiming both a Fourth Amendment violation and a due process violation. In any event, we will address the issues he raises on appeal.

### A. Outrageous Conduct by Law Enforcement

¶19. To support his claim of outrageous conduct, Moore contends that law enforcement's narrative report, consisting of forty-one pages, with 354 numbered paragraphs, is misleading

10

by concealing that

1. two search warrants were obtained;

2. the first warrant did not describe the business the officers first entered (Suite D);

3. the camera at issue was actually found in Suite D; and

4. the officers destroyed the first warrant.

Moore argues that law enforcement officers destroyed the first warrant and created a false narrative to conceal they had no warrant to enter or search Suite D. Citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973), and *Olmstead v. United States*, 277 U.S. 438, 468 (1928), *overruled by Katz v. United States*, 389 U.S. 347 353 (1967), Moore contends that all the evidence should have been suppressed due to law enforcement's outrageous conduct in this case. However, upon close examination, the officers' actions do not require suppression in the present case.

¶20. In *Russell*, 411 U.S. at 425, 431-32, the Supreme Court dealt with actions of law enforcement in a case where entrapment (i.e., alleged governmental participation in the crime) was the sole defense and main issue. In affirming the conviction, the Supreme Court noted:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952), the instant case is distinctly not of that breed . . . . **The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due**

11

**Process Clause of the Fifth Amendment.** *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S. Ct. 297, 304, 4 L. Ed. 2d 268 (1960).

(Emphasis added). *Russell* discusses how extreme misconduct by law enforcement would have to be shown before a due process violation could bar the entire prosecution. *Id*.

¶21. In *Olmstead*, 277 U.S. at 455, the Supreme Court was presented with the question of whether the interception of private telephone conversations by means of wiretapping "amounted to a violation of the Fourth and Fifth Amendments." Finding no constitutional violation and rejecting the effort to exclude the evidence obtained by the wiretap, the Supreme Court stated:

> A standard which would forbid the reception of evidence, if obtained by other than nice ethical conduct by government officials, would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it.

*Id*. Thus, *Olmstead* stood for the proposition that before evidence should be "excluded," it must be shown that the defendant's constitutional rights would be violated by admitting it.[6]

---

[6] In *Olmstead*, the interception of the phone calls was a violation of a misdemeanor statute in the State of Washington at the time. *Id*. at 469. Noting that argument, the court stated:

> This statute does not declare that evidence obtained by such interception shall be inadmissible, and by the common law, already referred to, it would not be. Whether the state of Washington may prosecute and punish federal officers violating this law, and those whose messages were intercepted may sue them civilly, is not before us.

*Id*. (citation omitted).

12

*Id.*; *but see Katz*, 389 U.S. 353-54 (questioning whether government action "complied with constitutional standards").

¶22. Before the trial court, Moore argued that a "first warrant" did not exist because it could not be produced by law enforcement. Therefore, the evidence was illegally seized without a valid search warrant. Based upon the testimony of Hansbro, Gates, and Judge Quimby at the suppression hearing, the trial judge specifically found that a first warrant *did* exist, that it was limited to Suite E, and that Hansbro had improperly destroyed the first warrant after obtaining an amended search warrant covering both Suites D and E. The trial judge further found that Hansbro's destruction of the first warrant was not done in bad faith. Citing *Graves v. State*, 708 So. 2d 858, 864-65 (¶33) (Miss. 1997), and *Carney v. State*, 525 So. 2d 776, 787 (Miss. 1988), the trial court ruled that "the officer's actions in halting the first search, securing the premises, and obtaining a warrant that included both suites were reasonable and that said conduct evinces a good faith effort to protect the constitutional rights of the Defendants." Giving deference to the trial court as required by *Wallace*, 363 So. 3d at 715-16 (¶12), we find that the trial judge's decision was supported by substantial evidence and was not clearly erroneous. This portion of Moore's argument is without merit.

**B.  Entry into Suite D Without a Valid Search Warrant**

¶23. Moore also argues that law enforcement directed Sholonda to enter the business to confirm that the camera/charger was still in the restroom. He contends that once Sholonda notified law enforcement that the device was indeed still present, law enforcement unlawfully

13

entered Suite D and found it. Thus he argues that multiple law enforcement officers and their

agent, Sholonda, unlawfully entered Suite D without a warrant. It is important to note that

these businesses were open to the public and that Sholonda was still an employee at the time

she entered the business.[7]

¶24.    In *Murphy v. State*, 426 So. 2d 786, 788 (Miss. 1983), the supreme court stated:

> The evidence shows that various people went to and from the shop for the
> purpose of doing business with appellant[, and] we hold that it was a public
> place. In *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L.
> Ed.2d 576, 582 (1967), the Court said: "What a person knowingly exposes to
> the public, even in his home or office, is not a subject of Fourth Amendment
> protection."

> In *United States v. Various Gambling Devices*, 478 F.2d 1194, 1200 (5th Cir.
> 1973), the Court said:

>> **The federal courts have consistently held that a law
>> enforcement officer may enter commercial premises open to
>> the public and observe what is in plain view.** *See Lewis v.
>> United States*, 385 U.S. 206, 87 S. Ct. 424, 17 L. Ed.2d 312
>> (1966); *On Lee v. United States*, 343 U.S. 747, 72 S. Ct. 967, 96
>> L. Ed. 1270 (1952).

> *See also Campbell v. State*, 278 So. 2d 420 (Miss. 1973).

(Emphasis added). The trial court found that upon entry into Suite D, law enforcement

discovered that although Sholonda was employed by Advanced, her "actual work space and

her restroom where she discovered the suspected hidden camera were actually located in

Suite D—an adjacent adjoining suite internally connected to Suite E through a small hallway

---

[7] We also note that before Sholonda or law enforcement entered Suite D, the trial
court found that they already had a valid warrant to search Suite E.

14

with a door that remained open." The court further found from the evidence that "[t]he initial search warrant authorized the search of the employee bathroom based upon the underlying facts and circumstances included with the probable cause affidavit despite it being incorrectly believed to be part of Suite E, not Suite D. Stated differently, the initial probable cause established grounds for a lawful search of [Sholonda's] employee restroom in Suite D albeit incorrectly labeled as being in Suite E." The trial court found that law enforcement then properly secured both suites and, in good faith, obtained a new search warrant for both suites. The trial judge found that both warrants were supported by probable cause and that all the evidence was seized after the second warrant was obtained and should not be excluded. We conclude that neither Sholonda (via agency) nor law enforcement violated Moore's Fourth Amendment rights by entering the businesses located in Suite D. Further, giving the trial court deference as to its factual findings, Moore's argument that all the evidence should be suppressed based on law enforcement's initial entry into Suite D is without merit.

### C. Irregularities in Issuance and Return for Search Warrants

¶25. To support his contention that all the evidence seized as a result of the search should have been excluded, Moore raises several additional points:

> **1. Judge Quimby allegedly entered a false time of issuance of the second warrant and failed to read the affidavits underlying the warrant.**

¶26. Moore contends that Judge Quimby "entered a false time of the issuance of the second warrant. Quimby put the time as 1:45, which was actually the time of the first warrant."

15

Moore contends that Judge Quimby did this to aid law enforcement in hiding the fact that the first warrant had been issued. Mississippi Rule of Criminal Procedure 4.3 provides as follows:

> Every search warrant issued by the court shall:
>
> (1) command the law enforcement officer to search, within a specified time not to exceed ten (10) days, the person(s) or place(s) named in the search warrant and to return the warrant and an inventory of the thing(s) seized to the court as designated in the warrant;
>
> (2) designate the court to which the warrant and an inventory of the thing(s) seized shall be returned; and
>
> (3) be signed and dated by the judge, showing the exact time and date and the name of the law enforcement officer to whom the warrant was delivered for execution.

At the suppression hearing, Judge Quimby testified that when Hansbro came back to him for the second search warrant, the judge was of the opinion that Hansbro was amending the first warrant. Judge Quimby stated that he put the time the first warrant was issued on the second warrant because "I wanted to keep the same time frame." As noted above, Rule 4.3(1) requires that the warrant be executed and returned within ten days of its issuance.

¶27. In *Brown v. State*, 325 So. 3d 687, 691 (¶15) (Miss. Ct. App. 2021), the trial judge failed to put the time that the search warrant was issued on the face of the warrant. The evidence showed, however, that the warrant was executed within hours of its issuance. In declining to find the search warrant invalid, this Court held:

> Because the officer executed the warrant within mere hours of its issuance, the laudable goals of execution of the warrant within ten days were met. Although

16

the warrant technically violated Rule 4.3, the search and seizure actions by the government in this case were in conformance with the Constitution. Thus, we find that the warrant's failure to provide the exact time was harmless error because the warrant was clearly executed within hours of issuance and within the mandated ten-day time frame . . . . In conclusion, the goals of Rule of 4.3 were met, and to hold the search warrant in this case invalid would, without doubt, put form over substance.

(Footnote omitted). Just as in *Brown*, the testimony in the present case shows that the second search warrant was executed within hours of its issuance, so the goals of the rule were met.

¶28.    Moore also contends that "Judge Quimby could not have possibly read the affidavits underlying the warrant because the warrants authorized a search for 'cash or drugs' . . . and no affidavit or other evidence claims any cash or drugs were involved." He questioned both Hansbro and Judge Quimby about "Attachment A" to the search warrant that is headed "Items to be seized." This provision, like other parts of the warrant, authorized the officers to search certain vehicles that may be found on the premises to be searched. The body of the search warrant authorized the officers to search for evidence of filming another person without permission where there is an expectation of privacy in violation of section 97-29-63. However, in the attachment, the officers were also authorized to search vehicles "which may contain drugs or cash exchanged or intended to be exchanged for drugs." Hansbro testified that those items should not have been listed in the warrant. Judge Quimby testified that he missed that language and that it should have been crossed out. The trial judge considered the testimony and the arguments presented and, citing *Carney*, 525 So. 2d at 784, found that this error should not invalidate the search warrant. In *Carney*, the supreme court reasoned:

17

> We submit that the portion of the warrant not based upon probable cause was invalid. The alternate view is that the inclusion of these items taints the entire warrant. However, it furthers this State's policy of encouraging the use of warrants to sever the properly listed items from the improperly listed ones.

*Id*. Here the trial court did not err by failing to suppress the evidence based on the language complained of in the warrant.

> **2.** **The same "Underlying Facts and Circumstances" document sworn to by Hansbro and Gates was presented for the second warrant, but Gates was not present at the time the second warrant was issued. Gates initialed as an affiant to the second warrant after it was executed.**

¶29. Moore cites no authority to support suppressing the evidence based on these allegations. Therefore, this issue is procedurally barred pursuant to *Reading*, 350 So. 3d at 1196 (¶19), and appellate Rule 28(a)(7). We note, however, there is no requirement that more than one affiant be present to obtain a search warrant. Hansbro testified that he printed and presented a new affidavit and search warrant for Judge Quimby's signature. He repeatedly testified that all the signatures on the second warrant were "new." He admitted that he utilized the "Underlying Facts and Circumstances" document that he and Gates previously had signed under oath before Judge Quimby. When presenting the judge with the second warrant, Hansbro told Judge Quimby that nothing had changed except the need to include both Suites D and E. Although Gates was not present when Hansbro obtained the second warrant, his presence was not necessary. Moore cites no authority for the proposition that Gates' initialing the second warrant after it was executed invalidates that warrant. The

18

trial judge found that the second warrant was properly signed and executed, and we find this decision was supported by substantial evidence. This argument is without merit.

> **3. Hansbro destroyed the first warrant in violation of Mississippi Code Annotated section 97-9-125(1)(a) and failed to return the first search warrant to the court in violation of Mississippi Rule of Criminal Procedure 4.4(b).**

¶30. Moore does not cite any authority for the suppression of evidence as a result of either of the violations he alleges. Therefore, this issue is procedurally barred. *Reading*, 350 So. 3d at 1196 (¶19). In any event, the trial judge found that the first warrant was not destroyed in bad faith. All the evidence was seized as a result of the second warrant, which the trial judge found to have been properly issued and executed. This argument is without merit.

### D. Conclusion as to the First Assignment of Error

¶31. The various arguments Moore presents in this assignment of error can cause the inability to see the forest for the trees. The facts presented to the judge who issued the warrants provided probable cause for the issuance of both search warrants. The facts presented to the trial judge at the suppression hearing showed that Sholonda, who worked for Moore Advanced, found a camera concealed in a cell phone charger plugged into an outlet in the restroom near her workspace. This device was capable of filming people using the restroom. She reported this activity to law enforcement. Sholonda was unaware that her actual workspace and the restroom she used were in the space identified as Suite D. Law enforcement obtained a search warrant for Suite E, the business address of Advanced. After

the officers entered the business and realized the problem with the warrant, they stopped their search and obtained a warrant covering both suites. There were simple mistakes made in the process of the issuance of the two search warrants; however, the trial judge correctly found that the mistakes did not violate Moore's constitutional rights.

¶32.  In *Delker v. State*, 50 So. 3d 300, 301-02 (¶4) (Miss. 2010), the chief of police for the Town of Marion made an arrest for felony DUI on a road he mistakenly believed to be within the Town of Marion. The court found that the evidence seized pursuant to this arrest was not subject to the exclusionary rule, and Delker's conviction was affirmed. In its analysis, the supreme court explained:

> This Court declines to delve into the legality, *vel non*, of the arrest. For purposes of deciding this case, we indulge Delker's contention "that there was a Fourth Amendment violation. The issue is whether the exclusionary rule should be applied." *Herring* [*v. United States*], 129 S. Ct. [695,] 699 [(2009)]. Even in the event of a Fourth Amendment violation, the supreme law of the land requires a case-by-case "balancing test" to be performed, and suppression ordered "only in those unusual cases in which exclusion will further the purpose of the exclusionary rule." *Kansas v. Ventris*, 129 S. Ct. 1841, 1845, 173 L. Ed. 2d 801 (2009) (requiring "balancing test"); *United States v. Leon*, 468 U.S. 897, 918, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Specifically:
>
>> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter *deliberate, reckless, or grossly negligent conduct*, or in some circumstances recurring or systemic negligence.
>
> *Herring*, 129 S. Ct. at 702 (emphasis added).

*Delker*, 50 So. 3d at 303 (¶12). The trial judge found that the confusion as to the exact

20

address of Sholonda's workspace and restroom, and the other problems discussed above,

created the need to obtain a new warrant. The actions law enforcement took in response did

not rise to the level of *deliberate, reckless, or grossly negligent conduct* that would invoke

the need to exclude the evidence seized pursuant to the warrants.

> **II.      Whether evidence existed to support the lewd and licentious element of Count 19 or the counts involving adult males.**

¶33.    Moore argues that Mississippi Code Annotated section 97-29-63's requirement of

"lewd, licentious or indecent intent" requires "proof of a sexually motivated intent." He

argues that there is no evidence that he had "a sexual desire" for the minor child or the adult

males. Therefore, Moore contends that because the State failed to prove that he had a

"sexual desire" to film the minor child and the adult males, the evidence is legally

insufficient as to those counts.[8]

¶34.    In *Gilmer v. State*, 955 So. 2d 829, 833 (¶9) (Miss. 2007), the supreme court

explained:

> The interpretation of a statute is reviewed de novo by this Court. *McLamb v. State*, 456 So. 2d 743, 745 (Miss. 1984). The first question in interpreting a statute is whether the statute is ambiguous. *Harrison v. State*, 800 So. 2d 1134, 1137 (Miss. 2001). **When a statute is unambiguous, this Court applies the plain meaning of the statute and refrains from the use of statutory construction princip[le]s.** *Pinkton v. State*, 481 So. 2d 306, 309

---

[8] We note that, at trial, Moore did not offer a jury instruction to define the terms "lewd," "licentious," or "indecent." Further, he did not object to the form of the State's elements instructions and did not argue before the trial court that the jury should be instructed it was necessary for the State to prove that he had a "sexual desire" for each particular victim.

(Miss. 1985). The court may not enlarge or restrict a statute where the meaning of the statute is clear. *State v. Traylor*, 100 Miss. 544, 558-59, 56 So. 521, 523 (1911). In interpreting statutes, this Court's primary objective is to employ that interpretation which best suits the legislature's true intent or meaning. *Clark v. State ex rel. Mississippi State Med. Ass'n*, 381 So. 2d 1046, 1048 (Miss. 1980).

(Emphasis added). In *Gilmer*, the supreme court held that section 97-29-63 is not ambiguous. *Id*. at 834 (¶11). As to the plain meaning of an unambiguous statute, the Legislature has provided in Mississippi Code Annotated section 1-3-65 (Rev. 2019) that "[a]ll words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning." In *Jones County School District v. Covington County School District*, 352 So. 3d 1123, 1130-31 (¶20) (Miss. 2022), the supreme court reiterated:

> Mississippi law further requires that "[a]ll words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning . . . ." *Lawson* [*v. Honeywell Int'l Inc.*], 75 So. 3d [1024,] 1028 [(¶9)] [(Miss. 2011)] (quoting Miss. Code Ann. § 1-3-65 (Rev. 2005)). "Where a popular word is used in a statute with no statutory definition, we follow the well-established rule that popular words in a statute must be accepted in their popular sense . . . ." *Lambert v. Ogden*, 423 So. 2d 1319, 1321 (Miss. 1982). We "frequently look to dictionaries to ascertain the meaning of a word in its common or popular sense." *Lawson*, 75 So. 3d at 1028 (collecting authorities).

¶35. Thus we must look to the common, dictionary definitions of the words used. According to The Merriam-Webster Dictionary, the word "lewd" means "obscene, vulgar." *Lewd*, The Merriam-Webster Dictionary 286 (2019 ed.). The word "licentious" means "promiscuous and unprincipled in sexual matters" and "disregarding accepted rules or conventions." *Licentious*, New Oxford American Dictionary 1006 (3d ed. 2010). The word "indecent" means "grossly improper or offensive" and "not decent." *Indecent*, The

22

Merriam-Webster Dictionary, *supra*, at 252. Moore could have been found guilty so long as the jury found that his conduct met the definition of any of these three words. *See Potts v. State*, 755 So. 2d 521, 526 (¶¶17-18) (Miss. Ct. App. 1999).

¶36. In *Stuart v. State*, 369 So. 3d 545, 551 (¶23) (Miss. 2023), the supreme court held:

> In order to obtain a conviction under Section 97-29-63, "four elements must be proven: (1) mens rea—lewd intent; (2) lack of consent; and (3) actus reus—secretly recording (4) in a protected location." *Gilmer v. State*, 955 So. 2d 829, 840 (Miss. 2007). "The mens rea presumption requires knowledge only of the facts that make the defendant's conduct illegal[.]" *Staples v. United States*, 511 U.S. 600, 622 n.3, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) (Ginsburg, J., concurring).

In that case, Stuart had set up a tablet to record the bathroom in the home he shared with his girlfriend Jane and her daughter Betsy. *Id*. at 548 (¶4).[9] Jane found the tablet and discovered a video of Betsy changing and showering in the bathroom. *Id*. She reported the video to the Lamar County Sheriff's Department, which eventually led to Stuart's indictment charging a violation of section 97-29-63(1)(a) for filming Betsy. *Id*. at (¶5). Stuart's defense was that he had intended to catch Jane talking on the phone to her ex-boyfriend and that he had no intention of recording Betsy, nor did he anticipate her to be in the bathroom. *Id*. at (¶4).

¶37. Thus, Stuart claimed the video was made by accident and sought a "theory of defense instruction on accident." In *Pierce v. State*, 250 So. 3d 493 (Miss. Ct. App. 2018), the defendant, in support of his request for an accident instruction, testified that he was using a

---

[9] Both victims' names in that case were changed to protect their anonymity. *Id*. at 548 n.1.

cell phone to keep time and accidentally turned on the video. *Id*. at 500 (¶21). Distinguishing *Pierce* from the facts in Stuart's case, the supreme court noted that Stuart did not dispute that he intended to video the bathroom, just that the video captured the wrong person. In affirming Stuart's conviction, the supreme court held:

> This could be sufficient evidence to assert that the subject and content of the video were accidental. But Stuart failed to submit any evidence that the video was *created or taken* on accident.

*Stuart*, 369 So. 3d at 552 (¶29).

¶38. The evidence in the present case shows that the hidden cameras were left in the restrooms for some period of time. They were motion-activated to film whoever entered the restrooms. Moore does not argue that the videos recorded in the restrooms were accidental but, instead, argues that they captured images of persons in whom he had no sexual interest (i.e. the males and minor child). Moore misses the point. Pursuant to *Stuart*, the State need only show that Moore placed the cameras in the restrooms to secretly film whoever entered the restrooms, a protected location under the statute, without the consent of those filmed. The jury could well find that such act was "lewd," "licentious," _or_ "indecent" whether Moore had any sexual interest in those filmed or not. This argument is without merit.

### III. Whether the evidence was insufficient to prove the necessary element of lack of permission as to the victims who did not testify.

¶39. The victims in Counts 2, 3, 4, 9, 14, 15, and 16 all testified at trial that they did not consent to being filmed while using the bathroom. In this assignment of error, Moore challenges the sufficiency of the evidence to support his convictions of Counts 5, 6, 7, 8, 10,

24

12, 13, 17, and 19 in which the victims did not testify at trial. Moore argues that because they did not testify, the evidence was legally insufficient to prove the element of lack of consent. Moore contends that there cannot be a presumption that the non-testifying victims did not give permission to be filmed in the employee bathroom.

¶40. Moore is correct that the State bore the burden to prove beyond a reasonable doubt that each of the non-testifying victims did not consent to being filmed while in the bathroom. However, this burden did not require that the victims themselves testify. In *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), the supreme court repeated our standard of review concerning the legal sufficiency of the evidence:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).
>
> > [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.
>
> *Id*. (alteration in original) (quoting *Shelton v. State*, 214 So. 3d 250, 256 [(¶29)] (Miss. 2017)).

Also, in *McCray v. State*, 263 So. 3d 1021, 1029 (¶25) (Miss. Ct. App. 2018), this Court

25

stated:

> "Circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence, and, in fact, 'a conviction may be had on circumstantial evidence alone.'" *Williams* [*v. State*], 122 So. 3d [105,] 108-09 (¶17) [(Miss. Ct. App. 2013)] (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981) ). *We note that "the jury may draw any reasonable inferences from all the evidence in the case."* *Id*. at 108 (¶ 17) (quoting *Anthony v. State*, 23 So. 3d 611, 623 (¶53) (Miss. Ct. App. 2009)).

(Emphasis added); *accord Nevels v. State*, 325 So. 3d 627, 634 (¶¶19-21) (Miss. 2021). According to the standard, we must view the evidence in the light most favorable to the prosecution and give the prosecution the benefit of all reasonable inferences that may be drawn from that evidence.

¶41.    Again, in the present case, the jurors heard testimony that a camera disguised as a cell phone charger was used to secretly film persons in the restroom. The camera was motion-activated to film whomever entered the restroom. Seven of the victims testified at trial that they did not give Moore consent to film them in the restroom. The jurors also saw the resulting videos and photos of the non-testifying victims. Based on the non-testifying victims' actions in the restroom, the jurors could infer that they were not aware they were being filmed and had not given their consent to be filmed. When the evidence is viewed in the manner required by *Eubanks*, we find that the evidence was legally sufficient to support the jurors' finding of a lack of consent by the non-testifying victims. *Eubanks*, 341 So. 3d at 909-10 (¶41).

## CONCLUSION

26

¶42.    The trial court did not err by failing to suppress the evidence obtained as a result of the search, and the evidence is legally sufficient to support Moore's convictions as set forth above.  We find no reversible error and affirm his convictions and sentences.

¶43.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**